IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA

v.

KHALED MIAH

Criminal No. 21-110
Judge W. Scott Hardy

## UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

AND NOW comes the United States of America, by its attorneys, Stephen R. Kaufman, Acting United States Attorney for the Western District of Pennsylvania, and Jessica Lieber Smolar, Assistant United States Attorney for said District, and hereby submits this Response in Opposition to defendant Khaled Miah's Motion to Dismiss (Doc.45-1)("Motion").   For the reasons set forth below, the Government submits that the Motion to Dismiss the Indictment should be denied without a hearing.

Defendant Khaled Miah was advised by FBI agents that they were investigating his online threats and social media accounts. In response, Miah targeted the investigating agents by posting threats directed to them invoking the highly sensitive September 11, 2001 World Trade Center terrorist attacks (Counts 1, 4, and 6), listing the specific coordinates of FBI Headquarters (Count 3), and warning that future terrorist attacks were coming (Counts 2, 5, and 7). He made these threats knowing and intending that the FBI, and specifically the FBI employees he named in the posts, would read them. Now he seeks to escape responsibility for his actions by arguing that this Court should ignore their context and read his threats in a vacuum. But his challenge is plainly premature, his argument that this Court should ignore context contradicts existing caselaw, and his dangerous statements and are not protected by the First Amendment.

1

## I.      Background and Procedural History

The FBI attempted to interview defendant in September 2020 to discuss reports received by law enforcement regarding Miah's online activities. (Indictment, Doc. 33, at ¶3.) Miah was entirely uncooperative with the agents. (*Id*.) Instead, he scrubbed his online activity by deleting tweets[1] and an entire Twitter account that he knew was being investigated. (*Id*. at ¶5). He then weaponized his social media accounts into tools to harass and threaten FBI personnel, their families, and the Bureau as a whole. He first targeted the civilian wife of an FBI Special Agent, posting her photograph, her biographical information to include her actual place of work, educational background, and her age, hair color, religion, and original hometown in the United States, as well as crude and sexual comments about her and the Special Agent, on an existing Twitter account that he knew the FBI was watching. (*Id*.) He then created two new Twitter accounts to attack the same agent, as well as an FBI Supervisory Special Agent. (*Id*. at ¶9.)   One of these accounts, which Miah intentionally named @marienstrasse, was a direct reference to the address in Germany where several of the 9/11 attackers lived prior to the attack that killed nearly 3,000 people on September 11, 2001. Defendant again took his attacks beyond FBI personnel by targeting the Special Agent's wife and siblings on the platform he knew the FBI was investigating. (*Id.*).

On or about October 9, 2020, a federal search warrant authorized the search of Miah's residence and seizure of his electronic devices.   An examination of Miah's electronic devices and

---

[1]   Twitter is an internet-based communication platform based in California that is accessed by computer, smartphone, and other electronic devices that connected to the internet, and allows users to, among other things, post messages to the public using unique screen names. (Indictment at ¶2),   A "tweet" is a message posted to Twitter containing text, photos a GIF and/or a video.

online accounts by the FBI revealed Miah's interest in weapons, his fascination with violence, and his pronounced animosity toward law enforcement. (*Id*. at ¶ 6.)   In or around November 2020, Miah created and controlled two new Twitter accounts after the seizure of his electronic devices a month prior.   Miah used both Twitter accounts to tweet messages over the Internet about an FBI Supervisory Special Agent and Special Agent A by name and indicated that he had researched their personal lives, prior professions, current city and Special Agent A's wife, siblings, hometown, and education. (*Id*. at ¶ 9.)

In December of 2020, defendant created yet another new Twitter account that he named, "Federal Intelligence Service" or @ServiceFederal, and escalated his threatening, intimidating and harassing activity aimed at the Pittsburgh FBI agents and the FBI. (*Id*. at ¶10.) From this new @ServiceFederal account, Miah began posting tweets referring to the highly sensitive September 11, 2001 terrorist attacks right after naming specific FBI personnel and telling them that he will choose the time when "the deed will be done." (*Id*. at ¶11.) He deleted those posts the next day. (*Id*. at ¶12.) He followed up with additional tweets referring to "the zero hour is approaching," listing the coordinates of FBI Headquarters in Washington, D.C., and again naming specific FBI personnel while referring to the September 11 attacks. (*Id*. at ¶¶14, 17.) Finally, he threatened a crime scene stating that with FBI focusing on him, others may be ignored and that "[r]egardless, yellow tape will flow." (*Id*. at ¶18.)

Defendant did not limit himself to solely to online threatening conduct. Instead, according to FBI surveillance, Miah intentionally conducted reconnaissance of Special Agent A's residence on multiple occasions subsequent to the FBI's September 2020 attempted interviews of Miah. (*Id*. at ¶ 8.)    For instance, on or about the morning of November 6, 2020, Miah's vehicle drove around Special Agent A's apartment building and parked at a cemetery directly across the street from

3

Special Agent A's apartment building for approximately 10 minutes before leaving the area. During the evening of that same day, Miah drove from Pittsburgh to Washington, D.C., arriving shortly before midnight.   According to FBI surveillance, Miah spent the next several hours driving around and parking near major landmarks, including the White House and the Capitol Building. Later that evening, Miah returned to Pittsburgh and returned to the vicinity of Special Agent A's residence before returning to his typical route.   Miah repeated this behavior yet again during or about the evening of November 20, 2020. (Affidavit in Support of Criminal Complaint, Doc. 2 at ¶ 30).

The FBI is also aware that Miah's vehicle was located in the immediate vicinity of the FBI Pittsburgh Field Office, located at 3311 East Carson Street, Pittsburgh, Pennsylvania 15203, on at least eleven (11) occasions between November 1, 2020 and January 3, 2021. Many of these trips were late at night. (Affidavit in Support of Criminal Complaint, Doc.2 at ¶ 30). Simply stated, Miah had no apparent purpose to drive to the Special Agent's home or the FBI Pittsburgh Headquarters in the middle of the night except to conduct reconnaissance or to show the targets of his threats that he knew where they lived and worked.

As a result of his escalating threatening conduct directed to the FBI agents and the FBI, on January 5, 2021, the government filed its Criminal Complaint in this case and arrested Miah. (Doc. 2). Magistrate Judge Richard Lanzillo presided over the preliminary and detention hearings on January 8, 2021 and found probable cause that defendant committed the crimes charged in the Complaint and that the defendant's continued detention pending trial was warranted. (Doc. Nos. 18-20.) As was detailed at the detention hearing, the evidence in the possession of the FBI through its review of Miah's electronic devices and online accounts coupled with the FBI surveillance gave the FBI significant cause for alarm and concern with regard to defendant and obligated the FBI,

4

its personnel, and their family members to take his threats and actions seriously. For example, Miah had researched "VBIEDs" (Vehicle-Based Improvised Explosive Devices). (Detention Hearing, Exh. 4). He had recorded himself praising terrorists and threatening to rape women. (Detention Hearing, Exh. 7).) He had spent extensive time at the local shooting range and photographed himself with all sorts of firearms (Detention Hearing, Exhs. 8 – 12). He had taken pictures of his homemade explosive devices (Detention Hearing, Exh. 14). Finally, his iCloud and devices were chock full of terrorist propaganda, beheading images and videos, and his admiration of perpetrators of previous terrorist attacks, including the 9/11 attackers and the Tsarnaev brothers involved in the Boston Marathon bombing. (Detention Hearing, Exhs. 15 – 19).

A federal grand jury indicted defendant on March 16, 2021. He is charged with five counts of making threatening interstate communications in violation of 18 U.S.C. § 875(c), two counts of threatening to assault FBI agents in violation of 18 U.S.C. § 115(a)(1)(B) and one count of obstruction of justice by deleting Twitter accounts and postings in violation of 18 U.S.C. § 1519. He now moves to dismiss the Indictment before trial.

## II. Defendant's Motion to Dismiss is Premature

Pursuant to Rule 7 of the Federal Rules of Criminal Procedure,

> The indictment or information must be a plain, concise, and definite written statement of the essential facts constituting the offense charged and must be signed by an attorney for the government. It need not contain a formal introduction or conclusion. A count may incorporate by reference an allegation made in another count. A count may allege that the means by which the defendant committed the offense are unknown or that the defendant committed it by one or more specified means. For each count, the indictment or information must give the official or customary citation of the statute, rule, regulation, or other provision of law that the defendant is alleged to have violated.

Fed. R. Crim. P. 7(c)(1)*; see also United States v. Urban*, 404 F.3d 754, 771 (3d Cir. 2005). In the Third Circuit, "[i]t is well-established that an indictment returned by a legally constituted and unbiased grand jury,. . . *if valid on its face,* is enough to call for trial of the charge on the merits." *United States v. Huet*, 665 F.3d 588, 594 (3d Cir. 2012) (internal quotations and citations omitted). An indictment is sufficient if, when considered in its entirety, the indictment adequately informs the defendant of the charges against him so that he can prepare a defense and invoke the double jeopardy clause, when appropriate. *Urban*, 404 F.3d at 771. A sufficient indictment "(1) contains the elements of the offense intended to be charged, (2) sufficiently apprises the defendant of what he must be prepared to meet, and (3) allows the defendant to show with accuracy to what extent he may plead a former acquittal or conviction in the event of a subsequent prosecution." *Huet,* 665 F.3d at 595 (internal quotations and citation omitted); *see also United States v. Fielder*, No. 2:19-cr-8, 2020 WL 5232824, at *2 (W.D. Pa. September 2, 2020). In general, an indictment satisfies these requirements when it informs the defendant of the statute with which he is charged, lists the elements of the offense, and specifies the time period during which the violations occurred. *Huet*, 665 F.3d at 595.

At the Rule 12 stage, a district court's review of an indictment is limited to a determination of whether, assuming all the facts in the indictment are true, a jury could find that the defendant committed the offense with which he is charged. *Huet*, 665 F.3d at 595-96. A pretrial motion to dismiss an indictment is not a permissible vehicle for challenging the sufficiency of the government's evidence. *Id*. at 595. As this Court has observed,

> [T]he Court's consideration of a motion to dismiss an indictment on this basis is, generally speaking, a narrow, limited analysis geared only towards ensuring that legally deficient charges do not go to a jury.

*Fielder*, 2020 WL 5232824, at *2. At the Rule 12 stage, the court is not tasked with "weighing

proofs" or "judging credibility," as those are issues for the jury. *United States v. Mack*, Crim. Action No. 19-692, 2020 WL 4934366, at *4 (E.D. Pa. August 24, 2020).

A court may not pre-try a case, and a motion to dismiss is not a device for a summary trial of the evidence.   Accordingly, "courts routinely rebuff efforts to use a motion to dismiss as a way to test the sufficiency of the evidence behind an indictment's allegations."   *United States v. Guerrier*, 669 F.3d 1, 4 (1st Cir. 2011) (collecting cases); *see also United States v. United Mem'l Hosp.*, 2002 WL 33001119, at *5 (W.D. Mich. July 23, 2002) (court denied, without oral argument, motions to dismiss filed by the defendants on grounds that "[a] motion to dismiss the indictment cannot be used as a device for a summary trial of the evidence… There is no such thing as a motion for summary judgment in a criminal case.").

Defendant moves to dismiss the Indictment under Federal Rule of Criminal Procedure 12(b)(3)(B) before the Government has had the opportunity to put on any evidence. The Indictment returned by the Grand Jury in this case is specific, sufficient and valid on its face. It contains a plain, concise, and definite written statement of the essential facts constituting the offense charged as required by Rule 7 of the Federal Rules of Criminal Procedure. S*ee Urban*, 404 F.3d at 771. Indeed, the Indictment in this case goes further than most notice-pled federal indictments and speaks to the specific dates and actions surrounding the threats in this matter. (Indictment at ¶ ¶ 1-18.) The merits of defendant's Motion depend, among other things, on the full context of his actions, the reaction of those he targeted, and other factual considerations that the parties will dispute at trial. Defendant's Motion to Dismiss should, therefore, be dismissed as premature.

### III.     **Defendant's Messages were True Threats Unprotected by the First Amendment**

Under 18 U.S.C. § 875(c), it is illegal to "transmit[] in interstate or foreign commerce any communication containing any threat to kidnap any person or any threat to injure the person of

7

another." In *Elonis v. United States*, the Supreme Court held that the intent element of Section 875(c) is satisfied by showing that the defendant transmitted the communication "for the purpose of issuing a threat, or with knowledge that the communication will be viewed as a threat." 575 U.S. 723, 740 (2015). Similarly, under 18 U.S.C. § 115(a)(1)(B), it is illegal to "threaten[] to assault, kidnap, or murder . . . a Federal law enforcement officer . . . with intent to impede, intimidate, or interfere with such . . . law enforcement officer while engaged in the performance of official duties, or with intent to retaliate against such . . . law enforcement officer on account of the performance of official duties."

Both of these statutes require the charged statements to be threats. Whether a specific statement is a threat depends on its context. *United States v. Stock*, 728 F.3d 287, 301 (3d Cir. 2013) (government included sufficient context in the indictment to allow the court to determine that a reasonable jury could find defendant's statement expressed an intent to injure in the present or future.) A motion to dismiss under Federal Rule of Criminal Procedure 12(b)(3) a poor vehicle to resolve this debate, as "the government is not required to set forth its entire case in the indictment." *Huet*, 665 F.3d at 595.   "A pretrial motion to dismiss an indictment is not a permissible vehicle for addressing the sufficiency of the government's evidence. The government is entitled to marshal and present its evidence at trial, and have its sufficiency tested by a motion for acquittal pursuant to Federal Rule of Criminal Procedure 29." *Id*. Nevertheless, the United States included in the Indictment in this case allegations of the context surrounding defendant's threats. These allegations include defendant's surveillance of FBI buildings and an agent's home and disturbing internet searches concerning several of the agents and their families. The United States presented additional context evidence regarding defendant's interest in firearms and homemade explosive devices, violent images found in his possession of beheadings and torture,

his disdain for law enforcement and his interest in known terrorist attackers such as the Tsarnaev brothers during the preliminary and detention hearings (Docs. 18-20) and intends to present further contextual evidence at trial.

The threat in Count 1 is a December 27, 2020 tweet: "Currently eating pasta and watching the second plane hit the south tower. Nick, Dave, Mike and the whole bureau, the deed will be done at a time which is most opportunistic for me, chosen by myself.'" This tweet contains a direct reference to the highly sensitive September 11 terrorist attacks, names three specific FBI employees, and warns of a "deed" that the defendant is in control of. While it does not list a date, time or method of the planned "deed," its only conceivable purpose is to threaten an attack.

The threat in Count 2 is a tweet stating: "The zero hour is approaching." Sent the day after the previous tweet, it can only refer to the same "deed" defendant mentioned in Count 1. Count 3 is the coordinates of FBI Headquarters in Washington, D.C. It adds specificity to the threats in Counts 1 and 2 by suggesting a location for the "deed."

Counts 4 and 6 refer to two tweets sent back to back. The first was: "Rasheed, Dave, Nick, Mike…how's your investigation going? Things are looking 'bright' in 2021. Did you find the Saudi passports?" The second: "2001-2021 is 20 years. An entire generation, yet men like me still exist and pop up into existence. Next time you come in cowboy with the crew, the hardwood will collapse beneath your feet." Again, defendant refers to the horrific September 11 attacks. He even directly compares himself to the attackers by connecting them with "men like me." He also specifically names four FBI employees he knows to be investigating his conduct (three of them for a second time) and issues a direct threat to them harkening back to the hardwood in his residence when they conducted a search warrant execution. The following day, he posted the tweet in Counts 5 and 7: "Remember boys, the more eyes on me, the less eyes on the others. Regardless,

9

yellow tapes will flow." The 'boys' in this message refer to the four FBI employees to whom he has been directing his tweets. "Yellow tapes" is a reference to crime scene tape. He is saying that whether it is by his hand or the hand of somebody else while the FBI is watching him, there will be a crime scene.

Defendant incorrectly asks this Court to ignore the context and read the tweets standing alone, claiming that "Count 2 is practically meaningless" and Count 3 is just the coordinates of FBI Headquarters. (Motion, Doc 45-1, at 8.) However, the case he cites for that proposition states the exact opposite proposition: "When our law punishes words, we must examine the surrounding circumstances to discern the significance of those words' utterance, but must not distort or embellish their plain meaning so that the law may reach them." *United States v. Bagdasarian*, 652 F.3d 1113, 1120 (9th Cir. 2011). Indeed, the *Bagdasarian* court then went on to examine the context. 652 F.3d at 1121. Bagdasarian was charged with making statements that then-candidate Barack Obama should be shot. The Court of Appeals for the Ninth Circuit specifically noted in overturning his conviction that Bagdasarian's statements did not suggest that he intended to carry out the shooting himself, that he posted them on a financial message board, and that the people who read his messages on that board did not interpret them as a threat. *Id*. This is all context that the Court had in front of it after a bench trial.

The context in this case is quite different and far more concerning. Unlike Bagdasarian, defendant posted his threats on Twitter accounts that he knew the FBI agents he was targeting were investigating. And, again unlike Bagdasarian, defendant here specifically stated that he would be involved in carrying out the threat by saying the deed would be done at <u>his</u> chosen time and comparing himself to the 9/11 attackers. The defendant posted the statements for the purpose of issuing a direct threat to the agents he knew were conducting a federal investigation into his

10

conduct. He knew that they would be taken as a threat (noting that he was attracting eyes on him) and was fully aware that the violent and troubling images and videos on his seized devices were in the possession of and known to the FBI agents he was threatening. Evidence at trial will reveal that Miah intended to interfere with the FBI's investigation and to retaliate for the agent's attempts to interview him. Both the action and intent requirements of Section 875(c) and Section 115(a)(1)(B) are clearly satisfied here.

Defendant's charged statements are also "true threats." True threats fall outside the protection of the First Amendment because they place the recipient in "fear of violence" and lead to "the disruption that fear engenders." *Virginia v. Black*, 538 U.S. 343, 360 (2003). In *Black*, the Supreme Court held that a Virginia statute that banned cross-burning with an "intent to intimidate a person or group of persons" violated the First Amendment because it "treat[ed] any cross burning as prima facie evidence of intent to intimidate." *Id*. at 347-48. The Court reiterated, though, that the First Amendment permits prosecution of true threats "where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Id*. at 359.

The threats here meet that standard. Defendant directed his threats to particular individuals (the named FBI employees and the spouse and siblings of an agent) and to the FBI as a whole. The context establishes that his threats were serious expressions. Unlike the defendant in *Elonis*, defendant here is not an amateur rapper or comedian showing off for his friends. The threats do not look like jokes or rap lyrics. Defendant posted them on a new Twitter account that he named "Federal Intelligence Service" and aimed at the federal agents by name; he intentionally did not make his threats on a place where only his friends or fans would see them. Defendant now claims that his threats are political statements or merely expressions of disapproval of FBI treatment of

11

Muslim men. (Motion, Doc 45-1, at 10.) He does not explain how references to "the deed," "the zero hour," and "the hardwood will collapse beneath your feet" are political. And his actions put the lie to those words. Someone who merely disapproves of government actions does not surveil the agent's home and family.

The Court of Appeals for the Third Circuit has found similar statements to be true threats. In *United States v. C.S.*, the defendant bandied about ideas for attacking the Washington Monument, local churches, or a random Christian family. 968 F.3d 327, 240–43 (3d Cir. 2020). He did not give a specific time or settle on a location for the attack. *Id*. The Third Circuit found that his statements were true threats. "There is no rule that conditional statements, statements conveying a vague timeline or condition, or even wishes can never be a true threat." *Id*. at 245. The Court examined the context behind the threats, including the defendant's collection of weaponry, the photos he posted of that weaponry, and his interest in violence and terrorism in holding that "a rational factfinder could find that a reasonable person would view C.S.'s statements as a serious expression of an intent to inflict injury." *Id*. The Third Circuit also used context—the defendant's internet searches, knowledge of ISIS vernacular, and possession of ISIS insignia—to hold that the defendant possessed the requisite subjective intent. *Id.* at 246. The United States has strikingly similar contextual evidence in this case and this Court should afford the United States the opportunity to present this evidence at trial.

The defendant in *United States v. Voneida* also made similar threatening statements. 337 F. App'x 246 (3d Cir. 2009). Like the defendant here, the defendant in *Voneida* also celebrated a previous terrorist—in his case, the Virginia Tech shooter. He also made vague threats about future violence. He said: "Someday: I'll make the Virginia Tech incident look like a trip to an amusement park;" that he was "extatically [sic] happy" about the shooter, and that "the weary violent types

who are sick of self-righteous, lecherous, arrogant and debauched attitudes displayed by [A]merican youth would band together with me for a day, and allow everyone at schools and universities across the nation to reap the bitter fruit of the seeds that they have been sowing for so long." *Id*. at 248. His threats were vague as to time, target, and matter. He could have argued that he was just making a political statement about the attitudes of American youth. But the Court of Appeals for the Third Circuit held that a rational jury could look at the context—namely, that Voneida's postings appeared just two days after the Virginia Tech shooting—to find the statements were a serious intention to inflict bodily harm. *Id*. at 248. It upheld his conviction under Section 875(c).

One month before *Voneida*, the Third Circuit considered a similar case under Section 115(a)(1)(B). The defendant in *United States v. D'Amario* sent a federal judge a "memorandum" that warned that he was "extremely dangerous," that he "will not serve probation" or "take orders from federal judges and probation officers," that he would get a gun and violate his supervised release the day he is set free, and that it is "safer to revoke his supervision now . . . than to speculate on how this 'schizophrenic' who passionately hates NJ judges will react to sudden liberty." 330 F. App'x 409, 411–12 (3d Cir. 2009). D'Amario was convicted under Section 115(a)(1)(B). On appeal, he argued that his statements were sarcastic. After looking at the context surrounding D'Amario's statements, including the familiarity of the federal judge receiving the threat with D'Amario's criminal record and the judge's response to getting the threat, the Third Circuit rejected this argument. *Id*. at 413–14. The Third Circuit noted that it was up to the jury to decide whether D'Amario's memorandum was sarcastic or sincere. *Id*. at 414.

Finally, in *United States v. Stoner*, 781 Fed. Appx. 81 (3d Cir. 2019), the Court of Appeals for the Third Circuit stressed that where a defendant demonstrates an awareness of a violent event

13

and conveys a threat to commit similar violence, he plainly has the requisite intent to make a threat and was properly convicted of 18 U.S.C. § 875(c ).   The Court explained, "[R]eferencing a highly sensitive subject matter in a threat, such as a mass shooting of police officers, "make[s] it impossible to believe [defendant] was unaware it would be interpreted as a threat." *Id*. at 86. Notably, Miah referenced the highly sensitive violent terrorist attacks at the World Trade Center on September 11, 2001 in his threats. It is, therefore, impossible to believe that he was unaware that the FBI agents would interpret his postings directed at them as threats.

All of these cases have two things in common. First, in none of these cases did the court look at the statements in a vacuum. They properly evaluated them in their full context, which has not yet been presented in this case. Second, the courts left the question of whether a statement was a threat, a witticism, or a political statement to a jury in all but the plainest cases. This is not a case where the decision should be taken out of a jury's hands.[2]

## IV.   Defendant's Void for Vagueness as Applied Challenge Mirrors His First Amendment Challenge, and Should Fail for the Same Reasons

The defendant rehashes his points in arguing that the 18 U.S.C. § 875(c) and 18 U.S.C. § 115(a)(1)(B) statutes are void for vagueness as applied to his actions. Once again, he wants the Court to take each statement in a vacuum unless the context is favorable to him (such as his November 12 "I don't believe in violence" tweet). (Motion, Doc 45-1, at 17.) He again claims that his speech was not a threat because his statements were meaningless and satirical. (*Id*. at 16.) But to make these arguments is to refute them. If these statements were not threats, as he claims, then

---

[2] A case brought charging 18 U.S.C. § 115(a)(1)(B) recently went to the jury in EDNY. In *United States v. Brendan Hunt*, a jury convicted the defendant of making a true threat when he posted a video online entitled "Kill Your Senators" with the summary "Slaughter them all" that "threatened, or incited others, to murder members of Congress who were engaged in the performance of their official duties and in retaliation for such officials' performance of their official duties." *See* Crim. Action No. 21-CR-86 (PKC)(April 28, 2021 EDNY).

the statute would not apply to him. Because they are, it does. There is no vagueness as applied to Miah's threats.

Both of the charged statutes criminalize threats. The definition of a threat is not vague, but the law is clear that it requires context. A picture of a gun printed as part of a news article or circulated among a group of enthusiasts is not a threat. The same picture of a gun sent by a domestic abuser to his victim, a criminal defendant to a witness against him, or a convicted murderer to the judge who sentenced him is a threat. The need for context does not make either statute void for vagueness. That is why cases analyzing the application of these statutes to particular facts, including <u>every</u> case defendant cites in his Motion, consider only whether the relevant statements meet the statutory definition of a threat and the constitutional definition of a true threat. None of them finds that the statute is void for vagueness as applied.

Moreover, like his other challenges, the void for vagueness argument is premature. Defendant argues that the statutes are void as applied to him because they are "politically-charged and meaningless statements . . . made on a satirical social media page." (Motion, Doc 45-1, at 16.) However, whether the statements are politically charged or meaningless and whether the social media page is satirical are factual determinations that are too early to make. Further, all of the comparisons defendant makes (to *Kosma, C.S.,* and *Fullmer*) are comparisons that involve an evaluation of both context and circumstances. Defendant's as applied void for vagueness challenge is just a second attempt at his First Amendment challenge, is just as premature, and should fail for the same reasons.

### V.   **Defendant's Challenge to Count Eight Should be Denied**

Defendant asserts that Count Eight of the Indictment fails to state an offense because defendant's "Twitter activity" did not fall within the scope or intent of 18 U.S.C.§ 1519 and that

§ 1519 is unconstitutionally vague as applied to him.   The government submits that defendant's challenges to this Count must fail.

Count Eight alleges that Miah violated 18 U.S.C. § 1519 as follows:

> From on or about October 5, 2020 to and including  January 1, 2021, in the Western District of Pennsylvania, the defendant,   KHALED MIAH, did knowingly alter and delete Twitter accounts and postings with the intent to impede, obstruct, and influence the investigation and proper administration of a matter within the jurisdiction of the Federal Bureau of Investigation, an agency of the United States.

> In violation of Title 18, United States Code, Section 1519.
> .

(Indictment, Doc. 33 at. 10).   Moreover, the allegations set forth in the Indictment related to Miah's obstructive conduct in violation of 18 U.S.C. § 1519 demonstrate that subsequent to becoming aware of the federal investigation into his online threats, on or about September 28, 2020 and September 29, 2020, Miah made material changes and deletions to his known Twitter accounts. (Indictment ¶¶ 3- 4).   On or about October 8, 2020, Miah altered the outward facing profile photograph on one of his known Twitter accounts to depict a photograph of the FBI Special Agent known to be investigating Miah (Special Agent A)'s wife ("Victim A") and changed the display name from "@Lügenpresse_" to "@[Victim A's first name]presse."   The account was able to be viewed by the public.   The biographical information on Miah's account was also altered to include the actual place of work of Victim A, her educational background, and her age, hair color, religion, and original hometown in the United States, as well as crude and sexual comments related to Special Agent A and Victim A. (Indictment ¶ 5). Further, after posting threatening comments directed at the FBI agents investigating him on a known Twitter account, Miah subsequently deleted those posts a day later. (Indictment ¶ 13).

Title 18, United States Code, Section 1519 provides:

> Whoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction or agency of the United States or any case filed under title 11, or in retaliation to or contemplation of any matter or case, shall be fined under this title, imprisoned not more than 20 years, or both.

Miah's assertion that Count Eight should be dismissed for failure to state an offense is premised on his claim that § 1519 should not be applied to "police social media users" such as himself. (Doc. 45-1 at 17-24.) He asserts advanced knowledge of Twitter stating that as a college student with a purported "history of managing, modifying and deleting many Twitter accounts", Miah was familiar with Twitter's policies and "would have expected that his tweets were stored on Twitter's server" even after he deleted them. (Doc 45-1 at 20-21).

Miah's challenge to Count Eight for failure to state an offense lacks merit, first and foremost, because it plainly seeks to address on a pretrial motion the sufficiency of the evidence against Miah and is, therefore, premature. Indeed, none of facts set forth in support of Miah's Motion actually come from the Indictment in this case. Instead, he references unsupported Twitter polices, unsupported statements about Miah's skill set with regard to Twitter, and information concerning former President Trump's tweets.   (Doc. 45-1 at 21-23)

While premature, Miah's argument that the Court should not apply § 1519 to his alterations and deletions on his social media accounts is also legally unsupported. In *Giampietro*, defendant was federally charged with attempting to provide material support and resources to a foreign terrorist organization and with altering, destroying, mutilating or concealing evidence relating to a federal investigation in violation of 18 U.S.C. § 1519. Specifically, the government alleged in its Indictment that the defendant obstructed an FBI investigation by, among other things, altering or destroying her social media accounts. 2020 WL 4334913 at *4-5. The district court denied

17

defendant's Motion to Dismiss the § 1519 count holding that the § 1519 charge in the Indictment for altering and destroying social media accounts was properly pled and was not unconstitutional as applied to the defendant. The *Giampietro* court also cited the Third Circuit's decision in *Moyer* for the proposition that the word "record" in § 1519 can apply "to anything preserving information and constituting a piece of evidence about past events". Oxford English Dictionary (3d ed. 2009) (online version Dec. 2011). *Giampietro*, 2020 WL 4334913 at *4. Undoubtedly, defendant's Twitter accounts qualify as "records" under this definition.

Finally, should the Court decide to consider defendant's Motion to Dismiss Count Eight at this time, even though it is plainly premature and raises disputed questions of fact, the government submits that Miah's constitutional challenge to 18 U.S.C. § 1519 also must fail. Despite previously asserting his skill and advanced knowledge of Twitter. (Doc 45-1 at 20-21),   Miah now argues that § 1519 as applied is unconstitutionally vague because he, "as a person of ordinary intelligence, would not understand that deleting or modifying his Twitter accounts during the FBI's investigation was illegal", even though § 1519 broadly prohibits destructive conduct of many types in contemplation of obstructing a matter within the jurisdiction of the United States. Without providing the Court with any supporting case law, Miah claims that it would difficult for "an ordinary person to know that the law prohibits deleting a tweet after posting it in a public space, even during an ongoing investigation." (Doc 45-1 at 22-23) [3]   Count Eight is not unconstitutionally vague as applied to Miah.

When a defendant asserts that a statute is unconstitutionally vague, the court must first determine whether the litigant's speech or conduct regulated by the statute might be

---

[3]  A similar challenge to the § 1519 count in *Giampietro* was denied by the court. *See Giampietro*, at *9.

constitutionally protected. *United States v. Fumo*, 628 F. Supp.2d. 572, 596 (E.D. Pa. 2007) *quoting Aiello v. City of Wilmington,* 623 F.2d 845, 850 (3d Cir.1980).   If the defendant's "speech or conduct [is not] itself ... constitutionally protected," the defendant "must demonstrate that the statute under attack is vague as applied to his own conduct, regardless of its potentially vague application to others." *Id.* Miah's as applied challenge is unclear but appears to allege that his Twitter usage is being penalized in violation of the First Amendment (Doc. 45-1 at 22).

It is well established, however, that Section 1519 "regulates conduct, not speech. The conduct it regulates—destruction of documents with the intent to obstruct a federal investigation— is not expressive. Similarly, [section] 1519 does not regulate expressive association." *Fumo*, 628 F. Supp. 2d at 601; *see also United States v. McRae,* 702 F.3d 806, 837 (5th Cir. 2012); *United States v. Moyer,* 674 F.3d 192, 211 (3d Cir. 2012); *accord United States v. Brown,* No. 14 CR 674, 2015 WL 6152224 at *3 (N.D. Ill. Oct. 19, 2015) ("Section 1519 criminalizes the destruction, alteration, or falsification of records related to federal investigations and has no bearing on First Amendment freedoms.").

The court in *Giampetro* denied a similarly misguided argument brought by defendant. The court denied the defendant's motion to dismiss stating that the constitutional argument was underdeveloped and that "Section 1519 criminalizes the destruction, alteration, or falsification of records related to federal investigations and has no bearing on First Amendment freedoms" *Giampietro*, 2020 WL 4334913 at *10 (*citing United States v. Brown,* No. 14 CR 674, 2015 WL 6152224 at *3 (N.D. Ill. Oct. 19, 2015)).

The law in the Third Circuit likewise supports the conclusion that the plain language of § 1519 is clear and requires nothing more than ordinary intelligence to understand. As the Court of Appeals for Third Circuit observed in *Moyer*:

> The plain language 18 U.S.C.§ 1519 criminalizes a defendant's efforts to obstruct 'the investigation or proper administration of any matter' within the jurisdiction of the FBI, 'or in relation to or contemplation of any such matter.

*Moyer,* 674 F.3d at 206. *See also United States v. Yielding,* 657 F.3d 688, 715 (8th Cir. 2011); *see also United States v. Hunt,* 526 F.3d 739, 743 (11th Cir. 2008) ("A person of ordinary intelligence would understand a police report to be a 'record' or 'document,' and would also read the language 'any matter within the jurisdiction of [a] department . . . of the United States' to include an FBI investigation."). Congressional intent relating to this statute is also instructive. As Senator Patrick Leahy noted:

> Section 1519 is meant to apply broadly to any acts to destroy or fabricate physical evidence so long as they are done with the intent to obstruct, impede or influence the investigation or proper administration of any matter, and such matter is within the jurisdiction of an agency of the United States, or such acts done either in relation to or in contemplation of such a matter or investigation.

S. Rep. No. 107-146 at 14 (2002). This is not to suggest that it is illegal to post comments on social media platforms, or that the use of the Internet to communicate will generally subject a person to prosecution. Certain communications, however, may be the basis for a prosecution if they constitute threats, incitement to commit crimes, or are used as a means to further other criminal activity. *See, e.g.,* 18 U.S.C. §§ 112(b), 115, 119, 175, 229, 247, 373, 794, 842(p), 844(e), 871, 875, 876, 878, 879, 956, 1030, 1470, 1951, 2332a, 2332b, 2332i, 2339A, 2339B, 2383, 2384, 2385, 2389.   In this case, Miah is not being prosecuted for the innocent use of social media accounts, such as Twitter. He is being prosecuted for the specific manner and use of social media to obstruct a federal investigation.

Moreover, no court that has considered the issue has found § 1519 to be unconstitutionally vague. *See United States v. Kernell*, 667 F.3d 746, 756 (6th Cir. 2012) ("Section 1519 clearly sets out the elements that the government must prove for a conviction under the statute. All courts

looking at the question have rejected the constitutional challenge, and any ambiguities that might exist apply to a hypothetical defendant, not to Kernell and his specific conduct. For this reason, we reject Kernell's challenge to the constitutionality of 18 U.S.C. § 1519.").[4] *See also United States v. Cowden,* 2016 WL 5372841, *4 (N.D. WV, Sept. 26, 2016); *United States v. Hunt*, 526 F.3d 739, 743 (11th Cir. 2008 ("By its plain text, the statute placed [the officer] on notice his conduct was unlawful."). The Third Circuit reached the same conclusion in *Moyer*, adding that "[§] 1519's scienter requirement, moreover, eliminates any concerns regarding statutory vagueness." 674 F.3d at 211; *see also United States v. Stevens*, 771 F. Supp. 2d 556, 562 (D. Md. 2011) ("When construed as requiring proof of a specific intent to impede, obstruct, or influence a federal matter, § 1519 provides sufficient notice of what conduct is prohibited, and is not subject to arbitrary or discriminatory enforcement.").

The evidence at trial will establish, as set forth in the Indictment, that Miah was on notice of the federal investigation into his online threats and the social media accounts. Upon confrontation by the FBI regarding its investigation, he embarked on conduct clearly proscribed by § 1519 by altering one of his known Twitter accounts to reflect personal details concerning an FBI agent and his wife, deleting accounts that were being investigated by the FBI and making numerous tweets involving threats against the agents investigating him and then deleting the tweets and accounts shortly thereafter.   After being confronted by the FBI in September of 2020, Miah, a reasonable person of "ordinary intelligence", was on notice that his conduct with regard to his Twitter accounts risked prosecution. *United States v. Parish*, 942 F.3d 289, 295 (6th Cir. 2019).

---

[4]        The court also denied Kernell's various "as applied" challenges to § 1519. *See Kernell,* 667 F.3d at 755.

VI.     <u>**Conclusion**</u>

WHEREFORE, for the reasons set forth above, the United States respectfully requests that the Court deny defendant's Motion to Dismiss without a hearing.

                              Respectfully submitted,

                              STEPHEN R. KAUFMAN
                              Acting United States Attorney


                    By:     <u>*s/ Jessica Lieber Smolar*</u>
                              JESSICA LIEBER SMOLAR
                              Assistant United States Attorney
                              PA ID No. 65406

                              Dmitriy Slavin
                              Trial Attorney
                              National Security Division
                              Counterterrorism Section