# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES | ) | |
| | ) | |
| v. | ) | 2:21-cr-00110 |
| | ) | |
| KHALED MIAH | ) | (Judge W. Scott Hardy) |
| | ) | |

## DEFENDANT'S SENTENCING MEMORANDUM

Defendant Khaled Miah ("Mr. Miah") through counsel, respectfully submits this Sentencing Memorandum in connection with his sentencing by this Court on October 18, 2022. Part One of the defense's Memorandum sets out, per this Court's invitation, the additional evidence the defense considers relevant to the Court's determination of whether the U.S.S.G. § 2A6.1(b)(1) six-level enhancement should apply to Mr. Miah. Part Two of the Memorandum, per this Court's invitation, renews and supplements the defense's request for a downward departure pursuant to U.S.S.G. § 5K2.13 on the basis of defendant's untreated mental illness. Part Three of the Memorandum, addresses the 18 U.S.C. § 3553(a) sentencing factors and argues that a sentence between 36 and 41 months is sufficient, but not greater than necessary to serve the needs of this defendant and society.

In support of its sentencing argument under the 18 U.S.C. § 3553(a) factors, the defense argues that Mr. Miah's offense conduct is not atypical of threats offenses; that a sentence of greater than 41 months would result in disparate treatment when compared to other similarly situated cases, and that the personal history and characteristics of the defendant do not require extended incarceration to protect society or to serve the needs of the defendant.

# I.   SENTENCING GUIDELINES RANGE

## A.   A 6-point Enhancement under U.S.S.G 2A6.1(b)(1) (Intent to Carry Out Threat) is Unwarranted and Would Exaggerate and Misrepresent Mr. Miah's Intent

In its Tentative Rulings and Findings, this Court found that the 6-level enhancement per USSG § 2A6.1(b)(1) for conduct evidencing an intent to carry out the convicted threats is applicable to Mr. Miah. The Court, however, invited the defense to present additional evidence regarding the sentencing enhancement. The defense provides additional evidence and includes cites to the record in opposition to the application of the § 2A6.1(b)(1) enhancement.

### 1.   Overt Acts

The Third Circuit Court of Appeals requires the defendant to have engaged in an overt act to warrant application of the enhancement. Tentative Findings and Rulings, Doc. 317 citing *United States v. Brodie,* 824 F. App'x 117, 121 (3d Cir. 2020). At the heart of this issue is the question: what constitutes an overt act?

In federal criminal law, overt acts are elements of attempt crimes and of conspiracy crimes. For an attempt, an overt act is one that is a substantial step towards committing the underlying crime, and is required to distinguish it from "mere preparation". *United States v. Wesley*, 417 F.3d 612, 618-19 (6th Cir. 2005) ("Because of the problems of proving intent in attempt cases and the danger of convicting for mere thoughts, desires, or motives, we require that the substantial step consist of objective acts that mark the defendant's conduct as criminal in nature. This objective conduct must unequivocally corroborate the required subjective intent to engage in the criminal conduct."). In a conspiracy, an overt act is an act done in furtherance of the underlying crime. For purposes of the § 2A6.1(b)(1) enhancement, an overt act evidencing an intent to carry out a specified threat must be "an actual step toward the realization of

[Defendant's] threats." *United States v. Goynes*, 175 F.3d 350, 355 (5th Cir. 1999) (stating that "the fact defendant did not purchase a weapon or ammunition, travel to the victim's home or city, strike the victim or do any other *clearly recognizable overt act* that could be considered conduct evidencing an intent to carry out his threat" made the § 2A6.1(b)(1) enhancement inapplicable).

The Court tentatively found that the overt acts that showed Mr. Miah's intent to carry out the threats were: (1) travelling to the vicinity of Agent Edquist's residence; (2) going to a shooting range on a day he made a threatening post; (3) researching the agents and researching weapons, explosives and violence; and (4) travelling to the FBI Office in Pittsburgh at various times of day and night. These are not overt acts that evidence an intent to carry out "some type of terrorist attack" against the FBI, in Washington DC.

### 2. Evidence Regarding Mr. Miah travelling to the vicinity of Agent Edquist's Residence

The government offered evidence to suggest that Mr. Miah had driven past Agent Edquist's home on numerous occasions. The data points used, in fact, did not show that Mr. Miah had been at, or near enough, the Edquist residence to constitute being in the vicinity. One exception was when Mr. Miah's car was briefly in the cemetery across the street. Agent Edquist described the cemetery as being covered by large mature trees. This would obstruct the view of the home and the cemetery is separated by a busy road.[1] Most of the data points were several blocks away in a busy neighborhood, and for only a minute or two, which is consistent with driving down a busy road.[2] The only data point ever in the actual vicinity of the Edquist

---

[1] See Trial Transcript of Special Agent Nicholas Edquist, December 13, 2021, Doc. 303 at 92-95, and 104.

[2] *See* Trial Transcript of Richard Connor December 14, 2021, Doc. 305 at 135-141.

residence was inaccurately rendered by the FBI, which they admitted at trial.[3] The defense forensic expert was able to provide accurate data from the tracker for that date, which the FBI verified. The only time Mr. Miah's car drove directly past the Edquist residence was the evening of November 6, 2020, on his way back from an election rally in Washington, D.C. That is the route Mr. Miah would use to get to his own home when returning from Washington D.C., the car drove past and the data point is only there for a minute or two.[4]

November 6, 2020 is the last date Mr. Miah's car was near the Edquist residence. This was almost two months before his arrest. Mr. Miah never approached the residence, he did not take any pictures of the residence or residents, he never said anything in any of his tweets to suggest that he knew where Agent Edquist lived. Finally, Agent Edquist admitted that there was no evidence on any of Mr. Miah's devices that Mr. Miah ever located his address.[5] The defense forensic expert also testified that there was no evidence from any of Mr. Miah's devices that he had located Agent Edquist's address.[6]

Mr. Miah's actions here lack the specificity and detail that has been found to constitute evidence of an intent to carry out one's threats based on surveillance. *See United States v. Taylor*, 88 F.3d 938, 943 (11th Cir. 1996) (affirming six-level enhancement where many of the defendant's letters described "the [victims'] activities in a detail that seemed to indicate first-hand observation").

---

[3] *See* Trial Transcript of Special Agent Ahmad Hassanpoor December 14,2021. Doc 304 at 169; *See also* Trial Transcript of Special Agent David Foster, December 15, 2021. Doc. 305 at 5.

[4] *See* Trial Transcript of Richard Connor December 14, 2021, Doc 305 at 136-141.

[5] See Trial Transcript of Special Agent Nicholas Edquist, December 13, 2021. Doc 303 at page 46 at 17-25.

[6] Trial Transcript of Richard Connor, December 15, 2021, Doc. 305 page 155 at 18-25, and page 156 at 1.

### 3. Evidence Regarding Mr. Miah Visiting Gun Range on Same Day of A Threat Post

The Court tentatively found that Mr. Miah visiting a gun range in December, on one of the days he tweeted a threat, was an overt act evidencing an intent to carry out the threat. Mr. Miah had visited gun ranges recreationally for years. From the beginning of the FBI's investigation and surveillance they saw Mr. Miah frequent gun ranges without incident. Exhibit B, C. [7] No evidence was offered to suggest, or explain, why Mr. Miah's final visit to a gun range on a day he was also posting tweets online (which was most days for Mr. Miah), would suddenly evince an intent to carry out a terrorist attack against the FBI. Mr. Miah never bought himself a gun, or any ammunition. Agent Strebel, who reviewed all of Mr. Miah's internet activity from the month before his arrest, admitted Mr. Miah never searched for ways to buy weapons, or attempted any weapons transactions. [8] Many threat cases involve individuals who had legal weapons at the time of arrest, and those weapons were not found to be determinative of intent. *See United States v. Philibert*, 947 F.2d 1467, 1471 (11th Cir.1991). Visiting a gun range, which was routine for Mr. Miah, without more, does not show an intent to carry out any type of terrorist attack against the FBI.

### 4. Evidence Regarding Researching Agents, Weapons, and Explosives

The Court tentatively found that Mr. Miah researching the agents and researching weapons, terrorist attacks, and other topics of violence constituted overt acts that showed an intent to carry out his threats. Mr. Miah had been researching the agents for several months, only using their publicly available information. [9] He had researched weapons, news sites about

---

[7] Exhibit B, FBI 302 from August 8, 2020; Exhibit C, FBI SSG Report from September 28, 2020.

[8] *See* Trial Transcript of Special Agent Daniel Strebel, December 15, 2021. Doc. 305, at 47.

[9] See Trial Transcript of Special Agent Nicholas Edquist, December 15, 2021. Doc 303 at 42-45.

attacks, and violent videos for several years, some as far back as 2014.[10] The internet searches Mr. Miah did in December 2020 and January 2021 were not different from his previous search history. Before his arrest, he again routinely searched explosives, guns, and news stories of recent attacks in the United States.[11] Agent Strebel testified that Mr. Miah did not search anything specific regarding buying or making weapons.[12] Mr. Miah's searches did not indicate any sudden change in his behavior or any escalation. The search topics were surely poor taste on Mr. Miah's part, but there is nothing to suggest that Mr. Miah's similar research in December 2020or January 2021 would evince an intent to carry out a terrorist attack against the FBI, when it had not before.

Mr. Miah did not know if the FBI, or anyone, would ever see his tweets. He had no followers on his accounts and had not heard from the FBI since their September interview. Mr. Miah was all talk, as he had been on his numerous insulting/satirical Twitter Accounts (i.e. @FishingExpedition, @ServiceFederal, @bruhKhaled etc.). This is what Mr. Miah was convicted for—that his words, not his actions, crossed the line.

In the days before his arrest, the government had an FBI informant, Azzedine, in contact with Mr. Miah. Mr. Miah told the informant that he wanted to get away from the stress of the FBI investigation and invited him to drive to Miami together for vacation.[13,14] The FBI knew

---

[10] See evidence of online images and videos dating back to 2014. The government documented significant amounts of similar evidence in its 404(b) Notice, parts of which were excluded from trial as irrelevant, or unfairly prejudicial. ECF. No. 113.

[11] *See* Trial Transcript of Special Agent Daniel Strebel, December 15, 2021.

[12] *Id.*

[13] *See* Exhibit D, Khaled Miah text message conversation with FBI Informant "Azzedine", Dec. 27-Jan. 6, 2021.

[14] Exhibit E, FBI 302 from Dec. 27, 2020 - Report regarding informant's meeting with Mr. Miah states, "Khaled said the reason the FBI raided his house was because he found an FBI agent (Nick) information including his wife

this, and this is when they arrested him. This suggests that Mr. Miah did not intend to carry out his vague threats, because he was moving on after getting no reaction from the FBI for three months.

In *United States v. Jackson,* the Court identified sufficient overt actions to apply the enhancement, finding

> …given the close temporal proximity between Defendant's actions and the threats he made to M.O. and her family… the evidence shows that Defendant made repeated contacts to M.O. in an effort to find her location and traveled to both her home and a bar where she was out with a friend. He acted violently at both locations as he admits that he damaged M.O.'s residence, which she shared with her children. He then engaged in a verbal confrontation with M.O. outside the bar which ended with him taking her glasses from her face and throwing them onto the street…the serious nature of his actions give rise to an inference that he more likely than not had the intent to carry out his threats against M.O. and her family. (internal cites omitted). *United States v. Jackson*, No. 20-118, 2022 U.S. Dist. LEXIS 54858, at *16-17 (W.D. Pa. Mar. 25, 2022).

The actions described above crossed the line into concrete action, even violence, that would lead to the specific threat. The conduct the Court has tentatively relied on for Mr. Miah are not overt actions that demonstrate a substantial step towards realization of Mr. Miah's threats.

### 5. Evidence Regarding traveling in the vicinity of FBI Office Pittsburgh

Finally, the Court tentatively found that evidence of Mr. Miah's car being in the vicinity of the FBI Office in Pittsburgh on various occasions was an overt act evidencing an intent to carry out his threats. Agent Edquist explained at trial that the data points the FBI used to show that Mr. Miah's car had been in the vicinity of the FBI Pittsburgh Office, also showed that Mr.

---

online and posted it online in the form or memes. Khaled seemed it be in a happy mood and was laughing about everything, said he knows where the line is, and is not breaking any laws. Khaled was messing with the FBI and said he is done now, before he gets into serious trouble. Also said that due to his actions he believes he will have surveillance on him his whole life. … Khaled said in about a week he will be driving down to Florida to vacation for a week."

Miah was in the vicinity of the GetGo Gas Station across the street from the FBI building. [15] That was Mr. Miah's regular gas station, and the closest 24-hour gas station to his house.[16] Some of the data points on the government's exhibits only show Mr. Miah driving across the bridge back towards his house.[17] Mr. Miah was surveilled by the FBI at this GetGo gas station on numerous occasions as well. Exhibit F, G.[18]

There was no evidence of misbehavior, approaching the building, or anything alarming while Mr. Miah's car was in the vicinity of the FBI Office in Pittsburgh and the GetGo gas station. Mr. Miah had been driving in that area for several months, it was about a single mile from his own home. This alone is not enough to show an intent to carry out some type of terrorist attack against the FBI agents, the whole bureau, or the FBI Office in Washington, D.C. The ambiguous nature of Mr. Miah's threats are problematic here too because Mr. Miah is not alleged to have specifically threatened the FBI Pittsburgh Office, the coordinates he posted and was convicted of posting as a threat, were the coordinates for the Washington, D.C. office. Applying the enhancement based on Mr. Miah's car being tracked in the vicinity of his regular gas station, one mile from his home, is unwarranted. *See supra, United States v. Taylor*, 88 F.3d 938, 943 (11th Cir. 1996).

---

[15] *See* Trial Transcript of Special Agent Nicholas Edquist December 10, 2021, Doc 302 at 155-158.

[16] Exhibit F, FBI 302 SSG Report from September 7, 2020. Exhibit G, FBI 302 SSG Report from August 28, 2020. Both reports are samples of numerous examples of the FBI seeing Mr. Miah use the GetGo gas station immediately across the street from the FBI Office, and one mile from his house regularly.

[17] *See* Trial Transcript of Special Agent Nicholas Edquist December 10, 2021, Doc 302 at 158.

[18] See Exhibit F, G.

## B. Defendant's Recommended Sentencing Guidelines Calculation

The defense calculates the applicable sentencing guidelines range as follows:

| | | |
|---|---|---|
| Base Offense Level<br>18 U.S.C. §§ 875(c), 115(a)(1)(B) | § 2A6.1(a)(1) | 12 |
| Enhancement for more than two threats | § 2A6.1(b)(2)(A) | +2 |
| Official Victim Enhancement | § 3A1.2(a)(1) | +6 |
| **Total Offense Level** | | **20** |
| Criminal History | 0 points | Level I |
| **Guidelines Range** | | **33-41 months** |

## II. MITIGATING FACTOR WARRANTING DOWNWARD DEPARTURE PURSUANT TO 5K2.13, OR ALTERNATIVELY, 18 U.S.C. § 3553(b)(1)

The nature of a threat case is that an aggrieved party pursues their conflict with the person who aggrieved them, often retaliating through harassment and then eventually making threats against them. Mr. Miah was suffering long-standing mental illness when the FBI began investigating him. While Mr. Miah's online behavior was understandably concerning to the agents, Mr. Miah did not understand and was angry at what he perceived to be a violation of his First Amendment rights. Because of his psychosis and thought disorder Mr. Miah became focused on the FBI agents as his perceived attackers and that led to unwarranted anger and frustration on his part towards them. At times Mr. Miah would realize he was behaving foolishly, but then he would begin his behavior again, and again.

The FBI have recognized that mental health can play an important role in their interaction with targeted individuals. Here, Mr. Miah's mental illness caused him to behave erratically and to sustain a focused and unwarranted anger towards them.

A sentencing court may depart from the applicable guideline range if "...the court finds, pursuant to 18 U.S.C. § 3553(b)(1), that there exists an aggravating or mitigating circumstance."

§ 5K2.0(a)(1)(A).The Guidelines identify specific policy statements on areas of mitigation, including diminished capacity of the defendant. U.S.S.G. § 5K2.13 (Diminished Capacity) provides as follows:

> A downward departure may be warranted if (1) the defendant committed the offense while suffering from a significantly reduced mental capacity; and (2) the significantly reduced mental capacity contributed substantially to the commission of the offense. Similarly, if a departure is warranted under this policy statement, the extent of the departure should reflect the extent to which the reduced mental capacity contributed to the commission of the offense. However, the court may not depart below the applicable guideline range if(1) the significantly reduced mental capacity was caused by the voluntary use of drugs or other intoxicants; (2) the facts and circumstances of the defendant's offense indicate a need to protect the public because the offense involved actual violence or a serious threat of violence...

The guidelines also allow for a downward departure on a mitigating circumstance not addressed in the Guidelines pursuant to 18 U.S.C. § 3553(b)(1). 18 U.S.C. 3553(b)(1) states in relevant part that,

> In the absence of an applicable sentencing guideline, the court shall impose an appropriate sentence, having due regard for the purposes set forth in subsection (a)(2). In the absence of an applicable sentencing guideline in the case of an offense other than a petty offense, the court shall also have due regard for the relationship of the sentence imposed to sentences prescribed by guidelines applicable to similar offenses and offenders, and to the applicable policy statements of the Sentencing Commission.

Here, Mr. Miah's offenses warrant a downward departure because his serious mental illness complicated his case and played a significant role in the offense. Individuals with serious mental health issues present unique challenges. The FBI's Behavioral Analysis Unit published a manual on the assessment and management of "persons of concern" in threat cases titled "Identifying, Assessing, and Managing the Threat of Targeted Attacks" (FBI BAU Manual). This document discusses various special issues of concern and areas of consideration that arise in cases involving individuals with mental health issues. This document makes recommendations

that acknowledge the importance of diagnosis and treatment in threat management. The manual states in relevant part:

> Although pursuing a formal mental health diagnosis can be a distraction during the assessment process, diagnostic certainty is more useful during the management phase. Diagnosis by a qualified, licensed mental health professional can be a bridge to strategies for interacting with the individual, treatment if feasible, and an effective threat management plan overall. Mental health intervention should not be considered a standalone solution. Rather, it can and should be part of a comprehensive strategy when mental illness is an aspect of the case. Some persons of concern will be resistant or unreceptive to mental health treatment for various reasons. Even though they may not always be able to communicate back to a threat management team, mental health partners are good resources when psychiatric symptoms and behaviors are present. Evaluation and diagnosis can create additional opportunities for intervention and mitigation of any threat generated by the person of concern. FBI BAU Manual at 28.

Mr. Miah did not have a mental health diagnosis, as the FBI understands, that played a role in his escalating symptoms of paranoia and psychosis.

As Dr. Xenakis notes,

> Khaled's mental health deteriorated in the years leading up to his arrest. He acknowledges that the social isolation of the COVID pandemic aggravated his mental state. He coped with the isolation and its effect on his mood by consuming high doses of caffeine (Red Bull) and then calming himself at night with beer and alcohol. He became seriously depressed and suffered marked mood swings. Khaled slipped into erratic, bizarre and inappropriate behavior and communication that typify serious mental illness/psychosis. He recorded a series of videos of himself and reenactments of television and movies that relieved tension and distress. He had a pattern of wacky activity and verbalizations in the evenings, often when using and abusing alcohol and other substances, and then recognizing the bizarre and inappropriate nature of his conduct and behavior in the morning and trying to undo his acts. The patterns of erratic and bizarre shifts in mental state and inappropriate conduct are common with the serious mental illness/psychosis that he has suffered. He felt increasingly paranoid over being observed by the FBI and was annoyed by FBI surveillance. Exhibit H, Xenakis Sentencing Report at 9.

The FBI manual also identifies numerous mitigating factors that decrease the threat posed by any "person of concern." One factor stands out as particularly concerning here:

"On the radar": The mere fact that a person of concern is the focus of an assessment and management process, with buy-in by law enforcement and safety stakeholders, is a good starting point. Active threat assessment and management allows the team to devise and implement strategies to steer the person away from violence. The effectiveness of this mitigator depends heavily on engagement by stakeholders and support from the top down in each organization involved in the process. FBI BAU Manual at 28.

Mr. Miah was on the FBI's radar, but his bizarre and erratic behavior was understandably alarming. His mental health issues played a direct role in his offense as he could not just let the conflict with the agents go. He needed to have the last word. Since Mr. Miah's diagnosis and medication treatment post-arrest, Dr. Xenakis, who ultimately treated Mr. Miah notes,

Khaled has demonstrated improvement with treatment, complied with recommendations including medications, and expressed intent to engage in counseling and therapy. He has demonstrated a high potential for rehabilitation and compliance with recommendations for treatment and therapy. Exhibit H, Xenakis Sentencing Report at 11.

Dr. Xenakis also notes that Mr. Miah has improved significantly on medication and that he has had no behavioral problems or incidents while in prison. Exhibit H, 10-11.

Mr. Miah displayed poor taste and some very concerning interests and online behavior. Mental illness, when it is missed, can result in disastrous consequences for the affected individual, as it has here. The defendant requests that this Court consider this mitigating factor when sentencing Mr. Miah as a factor warranting a downward departure.

## III. SENTENCING ANALYSIS

In accordance with *United States v. Booker*, 543 U.S. 220 (2005), the Court is directed to impose a sentence in accordance with 18 U.S.C. § 3553(a). In so doing, the Court is to impose a sentence "sufficient, but not greater than necessary" to comply with the purposes of punishment set forth in 18 U.S.C. § 3553(a)(2). *Id.* (emphasis added); *see, e.g., Kimbrough v. United States*, 552 U.S. 85, 111 (2007) ("sufficient, but not greater than necessary" requirement is the

"overarching instruction" of § 3553(a)).  Those purposes include "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," 18 U.S.C. § 3553(a)(2)(A); "to afford adequate deterrence to criminal conduct," *id.* § 3553(a)(2)(B); "to protect the public from further crimes of the defendant," *id.* § 3553(a)(2)(C); and "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."  *Id.* § 3553(a)(2)(D).  In determining a sentence "sufficient, but not greater than necessary" to accomplish these purposes, courts must consider a number of factors, including "the nature and circumstances of the offense and the history and characteristics of the defendant," *id.* § 3553(a)(1); the guidelines sentencing range and any applicable Sentencing Commission policy statements, *id.* § 3553(a)(4), (5); and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," *id.* at § 3553(a)(6).

In this case, the Court has tentatively found a Guidelines range of 78 to 97 months. This is unreasonable considering the relevant conduct and would be outside even the most extreme sentences if it approached anywhere near this range.[19] In fact, this case is a text book example of why *United States v. Booker*, 543 U.S. 220, 259-60 (2005) and its progeny hold that the Guidelines are merely one factor for the Court to consider at sentencing, along with the other factors enumerated in § 3553(a). This discretion to vary from the guidelines is important in order to impose a just sentence in accordance with 18 USC § 3553(a). Indeed, as the Supreme Court

---

[19] The defendant has separately objected to the Guidelines calculation in his Objections to the PSR. Without addressing the core basis for the defense objections (there is insufficient evidence to support the 2A6.1 (b)(1) and 3C1.1 enhancements), the Court has tentatively applied these enhancements and the defense maintains their objection.

emphasized in *Nelson v. United States*, 129 S. Ct. 890 (2009),"[t]he Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable."129 S. Ct. at 892.

Accordingly, while the Court must still consider the Guidelines, *see* 18 USC § 3553(a)(4), nothing in the statute provides any reason to treat that calculation as more controlling of the final sentencing decision than any of the other factors a court must consider under § 3553(a) as a whole. *See United States v. Menyweather,* 431 F.3d 692, 701 (9th Cir. 2005); *United States v. Lake*, 419 F.3d 111, 114 (2d Cir. 2005), explaining *United States v. Crosby*, 397 F.3d 103, 11113 (2d Cir. 2005). In addition to lacking any presumption of reasonableness, the advisory Guidelines do not occupy any superior position among the factors listed in §3553(a) that a court must consider in imposing sentence.

## A. SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

### 1. History and Personal Characteristics

Khaled Miah is 29 years old. He is from Pittsburgh, Pennsylvania and the youngest child of his Bengali-American immigrant family, he has three brothers and one sister. Khaled is extremely close to his mother, he talks to her every day from jail. His father died in his arms when he was 17 years old, after many months wasting away with cancer in the hospital. He spent a lot of time in the hospital with his father, he hung on the doctors' and nurses' words but also seemed in denial and hopeful his father would recover. Attached to this Memorandum are a series of letters from Khaled's family and his long-time community supporters that address the Court and provide meaningful insight into Mr. Miah, information from their letters is contained below. Exhibit A.

In school, Khaled was teased by classmates in his mostly-white school for being a brown Muslim in America after 9/11. He was called "kaboom" and excluded by his peers. His older

brothers were similarly excluded and called names like "Osama". Khaled was a bit of an outcast at school, but he always wanted to fit in. After his father died, Khaled withdrew and his father's nurse – who had seen Khaled spending time in the hospital with his father when he was sick, and noticed Khaled in shock after being with his father when he died—advised Khaled's family to take him to see a therapist and keep an eye on him. She noticed he needed some help and support. The Miah family, in crisis, and with little understanding of mental illness, or treatments for such illness, were unable to properly seek care for Khaled. Khaled began spending several hours a day on the internet. That is where he consumed all types of media, interacted with others, read the news, watched porn, and learned about the lives of those around him. It is also where he would occasionally watch violent videos, or look at different weapons and groups. Khaled's online interests never became part of his real life. Eventually, Khaled came out of his mother's basement and decided to try and make something of his life. He got his GED, applied to universities, and eventually received admission to the University of Pittsburgh. He drove for Uber and Lyft to support himself. At college, Khaled finally joined in, and was accepted into mainstream society. He dated, he made some friends, he had roommates, he took classes he liked, he drank socially and realized that the outsider mindset he had developed could be abandoned. Khaled, managed to complete enough coursework for his finance major to be just one semester short of graduating. Then, COVID-19 hit. Khaled's new life suddenly disappeared. Classes were all online. Khaled was isolated. His untreated mental health issues deteriorated in quarantine. Back online with endless time, Khaled focused on the FBI investigation he felt he was a subject of. The FBI's attempt to interview him in 2019, where they instead only managed to speak with Khaled's brother and mother, began to weigh more heavily on his mind.

## 2. Nature and Circumstances of the Offense

In a typical threats case, an aggrieved party typically escalates their conduct to threatening the party they feel aggrieved by. Mr. Miah had been posting provocative images and comments online for years (of mock IEDs, terrorists, etc.). But when the FBI began investigating him for some of the comments, Mr. Miah became concerned and then angry. As a result, he began harassing the agents online (though not directly, on his Twitter account), eventually those turned into the threats he has been convicted of.

In 2019, the FBI went to Khaled's family's home looking to speak with him about a YouTube comment he posted that had been reported to them. Khaled was not at home and the agents instead spoke with Khaled's brother, Limon, and his mother. When he learned about the agents, Khaled's paranoia and mistrust of the FBI began to weigh on him. His older brother had been interviewed by FBI agents as a potential witness in a different case when Khaled was much younger and the experience had worried him. Khaled assumed the worst, after reading about FBI entrapment of young Muslim men in his community, and seeing his brother being questioned, Khaled imagined that the FBI had something sinister planned for him. When Khaled was stressed or upset he would drive for hours, even days, across the country. That summer, between semesters, the FBI was tracking him and watched him drive across the entire country.

During the pandemic, Khaled had started drinking more, eventually drinking a lot in the evenings and staying up late on the internet. In September 2020, after the FBI agents attempted to interview him, Khaled became apprehensive and angry. He was offended and felt that the FBI had crossed the line by questioning him about comments he made online.

Most people would heed FBI warnings about online content and use a healthy fear and respect of authority to regulate their behavior in such a situation. But Khaled was suffering from

long untreated psychosis and unspecified thought disorder. *See* Xenakis Report at 11. Khaled decided he would cleverly get even with the FBI agents, using only the internet to troll them. This, he believed, would be First Amendment protected activity that they could do nothing about. He searched the agents', and their families', social media profiles. He altered images of Agent Edquist's wife to imply that Agent Edquist had a small penis. Then Khaled started posting insulting and satirical tweets making fun of the agents. He called them Nazis, implied they were incompetent beneficiaries of nepotism within in the FBI. (He suggested Agent Edquist had an older brother in the bureau, and that is how he was placed with little experience). Khaled posted hundreds of these tweets over the course of three months. But they never got the reaction he was hoping for. The FBI never spoke to him again, he didn't know if they had even seen the tweets, they never reached out to speak with him about them.

In manic and nonsensical conversations with the FBI's informant, Micah Pressman, Khaled was distressed about the investigation, and concerned that his trolling would get him in trouble. He asked Micah for help or advice, often laughing hysterically at Micah's concern. Micah told Khaled, and the FBI, that Khaled needed psychiatric treatment. He offered to take Khaled to Western Psychiatric himself. Khaled refused. He thought he was going to outsmart the FBI. He thought they would violate his First Amendment rights and he would sue them for the constitutional violation. He had even spoken to a civil rights attorney about the investigation.

As Dr. Xenakis would later assess and explain upon evaluating and treating Khaled, Khaled suffered from long-standing psychosis and thought disorder that significantly impacted his poor decisions, and his lack of understanding of how his tweets would be perceived by others. While Khaled thought he was within the lines of insulting and toying with the FBI agents, he was unaware that his online behavior could also be read as scary and potentially dangerous.

As his drinking, and late night internet use began to spiral further, Khaled became overwhelmed with waiting for the FBI to confront him about his tweets. He decided to give up. In between the time President Joe Biden was elected and the Capitol Riot, Khaled was reading all of the political vitriol online. He was posting mocking posts supportive of Donald Trump. And then, he posted the tweets that resulted in the threats of conviction. For Khaled, these final posts were a form of signing off from his months-long Twitter trolling campaign against the agents. His final tweet, that he was convicted of posting as a threat was: "Remember boys, the more eyes on me, the less eyes on the others. Regardless, yellow tapes will flow". A strange jab at the FBI and the impotence he had been making fun of them for in his tweets.

After posting the threats of conviction, a week passed and Khaled was in touch with his friend Azzedine (also an FBI informant). Khaled invited Azzedine to join him for a long drive to Miami for vacation. He was tired of the stress of the FBI investigation, and he wanted a break from it. Azzedine agreed to go with him and they planned to travel to Miami in the next few days. Khaled never got to take his trip and was arrested by the FBI on January 6th, 2020.

### 3.  The Need to Avoid Unwarranted Sentencing Disparity

A critical sentencing factor in this case is the need to avoid disparities with the sentences imposed in similar cases. 18 U.S.C. § 3553(a)(6). The types of sentences imposed in threats cases in this District and beyond are thus instructive and appropriately considered by the Court. *See, e.g., United States v. Doan*, 498 F. Supp. 2d 816, 820 (E.D.Va. 2007) ("This Court does not dispute the value in looking nationwide to similarly situated criminal defendants of similar culpability that have committed similar acts resulting in similar convictions with similar backgrounds and with similar records under similar circumstances."). As set forth below, the

sentences imposed in decidedly more egregious matters involving threats have been in the range of probation to 70 months of incarceration:

- ***United States v. Dawn Bancroft,*** **21-cr-00271-EGS-1 (D.D.C.)**: The defendant in this matter participated in the U.S. Capitol Riot on January 6, 2021 and entered the building through a window. See Complaint, ECF No. 1. After exiting, the defendant filmed a video in which she stated, "We broke into the Capitol…we got inside, we did our part.' Bancroft continued, 'We were looking for Nancy to shoot her in the friggin' brain but we didn't find her.' [The complaint] affiant believe[d] that the 'Nancy' Bancroft was referencing is Speaker of the House, Nancy Pelosi." Despite having threatened to kill Speaker Nancy Pelosi while standing on the very steps of the U.S. Capitol, the defendant was never charged with threatening to harm a federal official. Instead, she was permitted to plead guilty to unlawfully Demonstrating in a Capitol Building, 40 U.S.C. § 5104(e)(2)(G), a misdemeanor that carries a maximum sentence of six months in prison. She is currently out on bond and scheduled for sentencing in February 2022.

- **United States v. Lucio Celli, 19-CR-127 (E.D.N.Y.)**: The defendant in this matter sent multiple emails to the Honorable Chief Judge Margo K. Brodie, the Honorable Brian M. Cogan, and the late Honorable Robert A. Katzmann, threatening to kill them. ECF No. 175, Government's Sentencing Memorandum, 1–2. He was arrested after sending at least four more emails to Judges Brodie and Cogan and other individuals "promising" and threatening to "hunt down and kill" them. Id. at 2. The defendant pled guilty to one count of transmitting threats to injure, 18 U.S.C. § 875(c). Although the Guidelines recommended a sentence of 24 to 30 months, the government agreed that a sentence of time served (4.5 months of incarceration) and two years of supervised release was appropriate. *Id.* at 3–4. Defendant was sentenced to time served (4.5 months).

He had been tweeting insults and jokes about the FBI agents for three months by the time he posted the vague threats in December 2020. Lucio Celli targeted his victims, knew their addresses, and was repeated and specific in his threats in comparison to Mr. Miah's threats of conviction.

• **United States v. Niviane Petit Phelps, 1:21-cr-20240-JEM (S.D.F.L.)**: The defendant in this case sent six videos to her imprisoned husband through the application JPay. On February 13, 2021, the defendant recorded two 30-second videos depicting herself threatening to kill Vice President Kamala Harris. In the first of these videos, the defendant said, "Kamala, you are going to die. Your days are numbered already. Someone paid me $53,000 just to fuck you up." In the second video, the defendant stated, "Kamala Harris put a dime on me. I put a dime back on her. $53,000 that's your fucking number. It's on your fucking head bitch." The next day, on February 14, 2021, the defendant filmed two additional videos. On February 18, 2021, the defendant recorded two more videos threatening to kill Vice President Harris. In the first, she stated: "50 days from today you will die… Vice President Kamala Harris you will fucking die 50 days from today… 53,000. I'm the hit man." In the second, she stated: "and fucking Kamala Harris I swear to god, today is your day, you gonna die. 50 days from today, mark this day down, you stupid bitch, Kamala fucking Harris vice president, you gonna fucking die 50 days from today." Two days later, on February 20, 2021, the defendant sent a photo of herself holding a firearm at a gun range. On February 22, 2021, the defendant applied for a concealed weapon permit. On March 6, 2021, the defendant admitted having knowledge that someone else could potentially see her videos, but stated that she did not care. She also stated that she does not know what would have happened if law enforcement had not shown up. The defendant pled guilty to six counts of

threats against the vice president, 18 U.S.C. § 871. The defendant was ultimately sentenced to 12 months and one day of imprisonment, followed by three years of supervised release.

Most notable here, in comparison to Mr. Miah, is the evidence regarding Phelps intent to carry out her very specific threats. She sent a photo of herself holding a gun the day after the threats, then two days later she applied for a concealed weapon permit, and she said she did not know what would have happened had agents not shown up. She claimed to have been paid $53,000 to act as a hitman. Mr. Miah's threats were far less serious, he did not have any such immediately following conduct, and he has maintained that he never intended any harm towards the agents. He was trolling them, he wanted to anger and provoke them. He did not imagine they would ever fear him. Ms. Phelps sentence was 12 months and one day of imprisonment, and her sentence should inform the Court's consideration, to ensure Mr. Miah's sentence is not disparate.

• **United States v. Brendan Hunt, 1:21-cr-00086-PKC (E.D.N.Y.)**: The defendant in this case recorded and uploaded an 88-second video on January 8, 2021, titled "Kill Your Senators," in which he stated the following:

> [W]e need to go back to the U.S. Capitol when all of the Senators and a lot of the Representatives are back there and this time we have to show up with our guns and we need to slaughter these motherfuckers. What I'm saying is that our government at this point is basically a handful of traitors, so what you need to do is take up arms, get to DC probably the inauguration . . . that's probably the best time to do this, get your guns, show up to D.C., and literally just spray these motherfuckers. Like, you know, that's the only option. They're gonna kill us. So we have to kill them first. So get your guns. Show up to D.C.; put some bullets in their fucking heads. If anybody has a gun, give me it, I will go there myself and shoot them and kill them. We have to take out these Senators and then replace them with actual patriots. Basically, I would trust anybody over them at this point uh this is a ZOG [Zionist occupied] government.

Later that day, he posted a message on Parler stating "… enough with the 'trust the plan' bullshit. lets go, jan 20, bring your guns . . ." Prior to this, on November 27, 2020, the defendant

posted a message to Facebook stating, "Like ive been saying all along, biden will NEVER set foot in the white house. we will mow down any commies who try to run a coup on america! MAGA!" He posted an additional video to Facebook on December 6, 2020. The defendant was convicted by a jury of one count of threatening to murder members of Congress in violation of 18 U. S. C. § 115(a)(l)(B) and §115(b)(4). The defendant was ultimately sentenced to 19 months of imprisonment, followed by three years of supervised release. The defendant was subject to a special assessment fee of $100 but no fine.

Mr. Hunt's threats were explicit, specific, and extremely dangerous because he was inciting many angry individuals to commit mass murder of elected officials. This was in a climate when several Capitol police and politicians had just been targeted or even injured. Mr. Miah's threats were ambiguous, seen by no one (as far as he was aware, though he hoped the agents would see them). Mr. Hunt also went to trial and was convicted. He received 19 months imprisonment and no fine. His threats and his surrounding conduct are significantly more explicit and threatening than Mr. Miah's.

• **United States v. James Dale Reed, No. 20-CR-406 (D. Maryland):** Mr. Reed delivered letters to homes with Democrat signs that included graphic death threats against U.S. President Joe Biden and Vice President Kamala Harris when they were candidates during the 2020 campaign. ECF No. 35, Government's Sentencing Memorandum, 2. The letters also threatened to murder any "Biden/Harris supporter[s]" and their children in their homes. Id. The defendant was known to the U.S. Secret Service for having emailed a nonprofit organization several times in 2014 with death threats against then-President Obama, Michelle Obama, former New York Governor Andrew Cuomo, and former New York City Mayor Michael Bloomberg. Id. at 5. *Around the time he made the threats, the defendant traveled to Gettysburg, PA on the same day*

*as then-candidate Biden*. Id. at 3. During a search of the defendant's home, the defendant's "*M4,*
*9mm S&W pistol, Highpoint 9mm rifle, and 12-gauge shotgun were seized* along with eight
canisters of ammunition for these weapons." Id. at 4. The defendant was also *in possession of*
*grenades, military gear, "a highlighted list of attendees at a conference about 10 years ago*
*(many of whom are/were U.S. government protectees), and a hand-drawn map of Frederick*
*Police Department Special Response Team tactical responses*." The government believed his
possession of these items "show[ed] an ability to carry through on his threaten [sic] behavior."
Id.

The defendant pled guilty to making a Threat to a Major Candidate for the Office of the
President or Vice-President, 18 U.S.C. § 879. The government recommended "[a] sentence of
eighteen months followed by a three-year term of supervised release." Id. at 5. The defendant
was ultimately sentenced to 7 months in prison and three years of supervised release.

• **United States v. Brogan, No. 19-CR-00207-NGG (E.D.N.Y.):** The defendant in this matter
called the office of a sitting United States Senator and left a lengthy voicemail calling her a
"stupid bitch" and repeatedly stating that he would "put a bullet in [her]" and "light her up with
[] bullets" because of her views on abortion. ECF No. 21, Government's Sentencing
Memorandum, 1–2. "The voice message also ma[de] explicit reference to Defendant Brogan's
potential travel to Washington, D.C., a fact that is made more alarming by a past social media
post discussing a previous" trip to the nation's capitol and, as discussed above, a potential future
trip to Washington, D.C. the next month." Id. at 4. The government's investigation confirmed
that he had recently traveled to Washington D.C. twice. *Id*. at 2. The defendant's criminal history
included at least five arrests and two convictions, including one where he traveled to a woman's
home after a traffic accident, tried to extort her, and then assaulted her husband. Id. at 4–5. The

defendant pled guilty to one count of threatening to murder a federal official, § 115(a)(1)(B) and the government recommended a sentence of 6 to 12 month's imprisonment. Id. at 3. The defendant was ultimately sentenced to three years of probation.

• *United States v. Troy Smocks,* **21-CR-198 (D.C.D.):** The defendant in this matter traveled to Washington D.C. on January 5, 2021 and, on the morning of the Capitol Riots, he posted a message on social media "containing a threat to injure law enforcement officers" that reached "tens of thousands of users". ECF No. 59, Government's Sentencing Memorandum, 1–2 (emphasis added). The message threatened that "millions" would "return on January 19, 2021, carrying Our weapons[.]" *Id*. at 2. After the Capitol Riot, the defendant sent "another threatening message on the social media service" that was "again viewed by tens of thousands of other users," threatening to "hunt down" and murder "RINOS, Dems, and Tech Execs" "over the next 24 hours." Id. at 3. According to the government, "defendant has a lengthy criminal history, with approximately 18 prior criminal convictions spanning from the early 1980s to 2006." *Id.* at 6. There the defendant pled guilty to one count of transmitting threats to injure, § 875(a). *Id.* at 1. The judge in Mr. Smocks case sentenced the defendant above the sentenced recommended even by the government. The defendant was ultimately sentenced to 14 months of imprisonment and 3 years of supervised release.

Unlike Mr. Smocks, Mr. Miah's threats were unspecific and did not articulate any particular planned violence. He also had not tried to incite thousands of others, and he did not travel to any FBI office or residence around the time of his tweets.

• **United States v. Kao Xiong, 18-CR-00235 (E.D. Ca.):** The defendant in this case " mailed over 150 threats and/or hoax letters targeting the United States President (POTUS), a Federal Law Enforcement Officer (FLEO), family of POTUS and a FLEO, FBI Offices, State Agencies,

private businesses and civilians since January 2017. The hoax/threat letters included death threats, bomb threats, assassination, extortion demands, and white powder." ECF No. 1, Complaint. Many of the letters reached their intended recipients, and caused serious disruptions to the White House, airports, companies, law enforcement. *Id.* "Each of the letters sent to a former POTUS required substantial law enforcement resources to properly assess, document, and preserve the evidence." *Id*. The defendant continued sending threatening communications after being interviewed by the U.S. Secret Service and being asked to stop. The defendant pled guilty to Conveying False Information Concerning Use of an Explosive, 18 U.S.C. § 844(e). ECF No. 46, Plea Agreement. The government agreed he was subject to a total offense level of 12, id., which resulted in a guideline range of 10 to 16 months. The government "recommend[ed] that the Court sentence defendant to a sentence at the low-end of the guideline range" and "that the Court impose a split sentence as permitted by U.S.S.G. § 5C1.1(d)(2), allowing the defendant to serve part of his sentence on home detention." ECF No. 50, Government Response to Presentence Report. The defendant was ultimately sentenced to time served (five months) and five months on home detention, followed by three years of supervised release.

• **United States v. Partick Carlineo, No. 19-CR-6140 (W.D.N.Y.):** The defendant in this matter contacted the office of Congresswoman Ilhan Omar and "[d]uring the ensuing conversation with a staff member, the defendant asked if the staff member worked for the Muslim Brotherhood, called Congresswoman Omar 'a fucking terrorist,' and threatened to 'put a bullet in her fucking skull.'" ECF No. 44, Government Sentencing Memorandum, 1–2. When the FBI went to his home, the defendant—a convicted felon—admitted he "illegally possessed six firearms and hundreds of rounds of ammunition." Id. at 7. The defendant pled guilty to one count of threatening to murder a federal official, § 115(a)(1)(B). In its sentencing submission, the

government noted that "it is troubling that the defendant—who, in addition to this case, has other criminal convictions involving threatening and/or harassing behavior []—possessed a cache of firearms and ammunition." Id. The government nevertheless recommended a sentence within the advisory guideline range of 12 to 18 months. Id. at 3. The defendant was ultimately sentenced to a year and a day and 3 years of supervised release. ECF No. 70.

- ***USA v. Credico,*** **2:14-cr-00118 (E.D. PA, May 25, 2017).** Mr. Credico's, while already on probation for crimes including terroristic threats and harassment, made vile, frightening threats against federal agents and members of their families. His criminal history included two prior convictions for harassment, another for terroristic threats, and a conviction for drug trafficking crimes. He additionally accumulated approximately five violations of probation/parole, and was the subject of three bench warrants. ECF No. 33, Governments Sentencing Memorandum, 3 (emphasis added). He threatened multiple people and agencies with harm. Id. At 4. Mr. Credico was sentenced to 70 months on each Counts one through Four, all terms to run concurrently to each other, he also received 3 years on each Counts One through Four, all terms to run concurrently to each other.

Mr. Miah has no criminal record and no history of violence. Unlike, Mr. Credico, Mr. Miah deserves the chance to learn from his mistakes and demonstrate that he will never be before this, or any Court, in the future.

### a. The Tentative Findings guidelines range are disparately beyond the heartland of similar cases

In view of the sentences in recent similar cases, it is clear that the Court's tentative guidelines range finding, are completely outside of the heartland of the sentences given in cases

like Mr. Miah's (most including worse conduct and more intentional threats.). Typically, a sentence within the guidelines range is presumed to be reasonable. That would not be the case here as a review of the similar cases are reveal sentences five to six times below the resulting range for Mr. Miah.

Mr. Miah did take his case to trial, and that means he is not entitled to the three level reduction in sentencing level that defendants who plead guilty receive (pursuant to 3E1.1). Many of the above cases were the result of guilty pleas. But a sentence four to five times the most similar cases sentences cannot be explained simply as a consequence of the defendant going to trial. That consequence is attributed to the now lost plea offer made to Mr. Miah, which the government disclosed to the Court. That offer would have resulted in an agreed recommended sentence of between 18-24 months for Mr. Miah. Forfeiting the three points he would receive for pleading guilty, Mr. Miah's recommended sentencing range is now more appropriately between 36 and 41 months.

Sentencing Mr. Miah to a period of incarceration beyond 41 months would create an unwarranted disparity in the sentencing treatment of other defendants in threats cases. *See* 18 U.S.C. § 3553(a)(6). This factor alone weighs heavily in favor of a sentence no greater than 41 months for Mr. Miah.

### IV.    NEED FOR THE SENTENCE IMPOSED

#### A.  Seriousness of the Offense, Promote Respect for the Law, And Provide Just Punishment for the Offense

Mr. Miah was convicted of threatening the FBI on his Twitter account. His threats were ambiguous, did not articulate a specific action to be taken, or a weapon to be used, or even a specific target. In light of the above threat cases, and their surrounding conduct, Mr. Miah's case

is similar to many of them, but lacks the aggravating factors of the worst cases. Those cases resulted in a majority of sentences being between probation and 19 months, some of the cases resulted in sentences up to 70 months. These types of cases are the world of sentences that determine the overall seriousness of the offenses. The defense recommended sentencing range of between 36 and 41 months sits squarely in the middle of the above referenced cases.

In contrast, the Court's Tentative Findings of a guidelines sentencing range between 78-97 months is significantly outside of the heartland of comparable cases. Instead of punishing Mr. Miah for the offenses he actually committed, the government is asking this Court to speculate and punish him for something he might do, instead of what he has done. Such a request places the Court in the role of thought police and that approach would result in widely disparate sentences. Sentences must be limited to considering the defendant's actual conduct. This is particularly true in threats cases because in every threats case there is always a possibility that a defendant would carry out a threat, but they did not. Punishing them beyond their conduct would transform threats cases into more serious cases that have never been brought.

**B.  Deterrence and Protection of the Public**

Mr. Miah has already been in detention since January 2020, over 20 months. That is a longer sentence than the vast majority of similar threats cases, including almost all of the above cases (with the exception of Mr. Credico, who had significant criminal history relating to threats and committed their offenses while on probation). Mr. Miah is a first-time offender, he was one semester away from graduating and being able to pursue a career. He has lost a lot, and he has put his family through immense suffering and public humiliation. There is little more Mr. Miah can be punished with, and excessive incarceration can only be to his detriment. He has been a

clear warning sign to all those who foolishly think their online actions will not have serious consequences.

It is notable that the government disclosed to the Court that before trial they made a plea offer to Mr. Miah with a sentencing range of 18 to 24 months. As discussed above, there is no reason that Mr. Miah's conduct before trial warranted a maximum sentence of 24 months, but post-trial would require three to five times that sentence. A loss of credit for acceptance of responsibility, 3 levels, would only account for an increase of a few months. The protection of the public is equally important pre-trial and post-trial. The government's own plea offer should be instructive of the seriousness of the offense and the response required for sentencing purposes.

### C. A Sentence that Provides Defendant with Needed Medical Care and Treatment

Section 3553(a) recognizes that the Court should take into account any medical issues facing the defendant and whether the sentence imposed will "provide the defendant . . . with needed medical care . . . in the most effective manner." 18 U.S.C. § 3553(a)(2)(D). Indeed, during the trial both the government's mental health expert and Mr. Miah's mental health expert indicated sensitivity to Mr. Miah's mental health issues and needs. *See* Trial Transcript of Dr. Otto, December 16, 2021, Doc. 306 at 29-32.

Mr. Miah is committed to continuing the psychiatric treatment he had been receiving and treating his other needs. At the outset of this case, the defense retained Stephen Xenakis, M.D. to assess Mr. Miah's mental health issues, opine on and develop treatment modalities that would address these issues and to assess whether Mr. Miah posed any risk or threat to himself or others I n the future.

Dr. Xenakis is ideally suited to conduct such an assessment – he is a retired Brigadier General in the U.S. Army with decades of experience addressing the most challenging and severe of mental health issues afflicting accused terrorists, combat veterans, etc. The Federal Courts and the Office of the Military Commissions have qualified him as a psychiatric and medical expert in numerous cases of detainees at Guantánamo Naval Base and accused terrorists.

Dr. Xenakis thus has experience in identifying extreme ideological views, if psychiatric issues are present, how to treat them, and how to assess the threat risk of various individuals. Exhibit H, Xenakis Sentencing Report at 10-12.

In his report, Dr. Xenakis opines,

> Khaled's mental state has improved…He demonstrates more appropriate behavior and interpersonal relationships. Most importantly, there is no record, reports, or documentation of conflicts or other problems with staff and inmates during detention and while receiving treatment. Accordingly, the assessment and treatment for a psychotic disorder are appropriate and effective.

> Khaled understands the requirements to comply with the law. He has willingly and enthusiastically complied with treatment and taken medications as prescribed... He has exhibited significant changes in mental state and has appeared calmer, speaks more coherently, and expresses better understanding of his problems and conduct. He feels that the treatment for his mental health problems has been helpful and has agreed to continue to comply with medications and therapy/counseling as available.

> Khaled's thought disorder and psychosis affected his ability to perceive that his statements constituted threats as interpreted by observers and readers. The medical records and clinical examination document compelling findings that Khaled has suffered from serious mental illness (SMI) since his father's death in 2010. He had exhibited signs and symptoms of psychosis with delusional thinking and perceptual disturbances, suicidal ideation, and self-injurious behavior as an adolescent. Despite the worrisome nature of his verbalization, activities, and behavior, Khaled does not present a serious threat to national security or safety. He has willingly complied with recommendations for treatment and not exhibited any troubling or irresponsible conduct since being arrested. He does not fit the profile of mass shooters or terrorists, did not engage in any planning a preparation, and exhibited no intent to carry out dangerous or harmful acts.

Significantly, Dr. Xenakis finds that Mr. Miah has improved with treatment and notes that in the

almost two years he has been in jail, he has had no disciplinary or other problems with anyone.

Dr. Xenakis' recommends,

> Khaled requires appropriate treatment and therapy in accordance with the
> standards of care for psychosis and past abuse of alcohol. He regards the
> treatment for his mental health problems as helpful and agrees to continue to
> comply with medication and therapy/counseling as needed. The assessment and
> treatment for serious mental illness/psychosis requires the coordination of
> multiple modalities and interventions.
>
> Khaled has demonstrated improvement with treatment, complied with
> recommendations including medications, and expressed intent to engage in
> counseling and therapy.  He has demonstrated a high potential for rehabilitation
> and compliance with recommendations for treatment and therapy.

Clearly, additional imprisonment is not needed in order to provide this necessary mental health

care, as Mr. Miah can arrange this same care from mental health professionals, at his own

expense, outside the federal prison system. *See, e.g., United States v. Alatsas*, 2008 WL 238559

(E.D.N.Y. Jan. 16, 2008) (imposing a term of probation, despite Guidelines range of 24-30

months where, inter alia, "[d]efendant has multiple complex medical problems, which will be

better cared for outside of prison.").

1. **Residential Drug Abuse Program (RDAP) to Meet Treatment Need of the Defendant**

As stated above, Dr. Xenakis recommends that Mr. Miah Receive appropriate alcohol abuse

treatment. The government's expert, Dr. Otto, also noted that such treatment would be beneficial

for Mr. Miah. The defense respectfully requests that as part of Mr. Miah's sentence he is

required to complete the Residential Drug Abuse Program (RDAP).

2. **Need of the Defendant for Community Support**

Mr. Miah currently has the support of his community and his entire family. They have all written personal, heartfelt and meaningful letters for this Court's consideration. Mr. Miah has faced significant personal struggles and will need this continued support upon his release. One of the serious disadvantages of extended incarceration is that as time goes on, inmates ties to the community become weaker and dissipates. Mr. Miah will need those ties, a sentence that requires extended incarceration will threaten Mr. Miah's successful reentry into society and rehabilitation. The defendant respectfully requests that the Court recommend Mr. Miah be sent to a facility close to his family in Pittsburgh, Pennsylvania.

### D. The Kinds of Sentences Available

All sentences all available to the Court and the Court has the authority and discretion to impose a wide range of alternatives to the term of incarceration contemplated by the Guidelines, The Court may impose strict conditions of supervised release, to include stringent mental health treatment requirements, as well as a strict regimen of reporting to a probation officer, submitting monthly financial reports and mandatory drug testing, to account for a lower sentence. Furthermore, Mr. Miah would be unable to purchase any weapons would be required to report any change in his residence or employment, all of which would significantly decrease the likelihood of any recidivism.

### E. The Need to Provide Restitution to Any Victims of the Offense

Per the Presentence Report, the Government did not indicate an intent to request that a fine be imposed. Probation, and this Court have tentatively calculated that Mr. Miah is subject to the various potential ranges of fines under the Guidelines. Tentative Rulings and Findings, Doc. 317. In any case, a fine, on top of any period of incarceration, is unwarranted. Mr. Miah is indigent. He would stand in a precarious position economically upon release as he will need to struggle to

rebuild his life and pay off loans. Mr. Miah will have no job to return to, and no source of income on the horizon. Mr. Miah may find it extremely difficult to find appropriate employment, given the fact of his felony conviction in this matter and the negative attention his case has received in the media – Googling his name results in numerous articles about his case. Imposing a fine would cripple Mr. Miah's already tenuous ability to get his life back in order upon release. For those reasons, the defendant respectfully request that the Court recommend that no fine or restitution is appropriate here.

**Conclusion**

For the reasons above, the defendant respectfully requests that a sentence of 36-41 months is sufficient but not greater than necessary for the needs of this defendant and society, and would not be disparate from similar cases; and that no fine is appropriate because Mr. Miah is unable to pay any fine or restitution and it would be a difficult burden upon his release.

Respectfully submitted this 29th day of September, 2022.

By: /s/ Charles Swift
Charles D. Swift,
Catherine McDonald
Pro Hac Attorneys for Khaled Miah
CLCMA
100 N. Central Expy, Ste 1010
Richardson, TX 75080
(972) 914-2507